May it please the Court, Michael Mayock appearing on behalf of Mr. Cottrell with Marvin Rudnick, who is seated at the Council table. Don't I know you some place from the old days? I tried my first case in front of you. Did you? When was that? A few years ago, when I was in the U.S. Attorney's Office. Okay, all right. I can't remember the name of the case. You're holding up better than I would like. I remember Mel was your bailiff. My bailiff? Was named Mel. I had a dream about him last night. Well, let me get started. On August the 22nd of 2003, in the early morning hours, Billy Cottrell and two others went out, spray painted certain slogans on vehicles at dealerships, a few on the street, and arson occurred involving a SUV in Monrovia. More spray painting occurred, and ultimately they wound up at Klippenster's Hummer dealership, where additional spray painting occurred as well as arsons. No one is denying and no one is suggesting other than the fact that Billy Cottrell was there at that time at all those places. That is not the issue. The issue is did he have a gross and verifiable disability, specifically Asperger's syndrome, which is an autism spectrum disease which has stark, tangible factors which differentiate this actor from others. That is a test under Johnson, this Court's decision. And it's also interesting to note that the DMS-IV-TR has set forth various characteristics and standards for identifying Asperger's syndrome. Two experts examined my client. They both said he had Asperger's. One was a prosecution expert. The other was a defense expert. From the outset, the Court knew that the defendant had Asperger's syndrome. There was a pretrial ex parte filing with the Court explaining exactly what the defense was going to be and exactly how we were intending to present it. And again, at post-trial, the judge himself said at sentencing, he has Asperger's. So there's no question about that. Both lawyers knew he had Asperger's. The only people who didn't know that he had Asperger's were the jurors. They didn't know. Now, in this case, the prosecution made three motions to try to eliminate Asperger's syndrome. It was initially to exclude it and the testimony of Dr. Gary Mezeboff, who actually had testified in one other case involving Asperger's for the U.S. Attorney's Office in Atlanta, Georgia, and said at that time that this person he examined did not have Asperger's. There are slews of cases, obviously, the Court is aware, in which Asperger's syndrome has come up as a verifiable and gross disability that is recognized. Secondly, the government then filed a motion to limit Asperger's, in which the court ultimately said that Asperger's syndrome testimony from an expert would be relevant only if the defendant testified, and it would be irrelevant as to his credibility on the foreseeability issue. Ultimately, after another few days elapsed, the government filed a third motion, suggesting that there was no foreseeability element in Pinkerton, and therefore Asperger's syndrome is something which is irrelevant. That was the status, and then after three days of trial, the court made a ruling, after the defendant had made an opening statement saying that he intended to call the defendant and would present Asperger's syndrome testimony. That was precluded, and the court then, to make things worse, although a cautionary instruction was provided to the judge at that time by the defense, decided not to give a cautionary instruction, not to castigate the defense by saying something that was improper, doing something that was wrong, but wait until the end of the case, and then just basically said, well, there is no Asperger's here, just disregard it. In the meantime, all that prejudice inured to the defendant throughout the trial. That's the status where we find ourselves right now. This was a case that could easily be characterized as a rush to judgment. There were multiple prosecutive errors that were made. Pressure on the FBI caused some of it. They caused Josh Canole, another individual who was wrongfully arrested, supposedly meeting all the characteristics of the alleged arsonist. That was wrong. Witnesses were pressured in the case, and in fact, in this case, the government took these witnesses' statements and would say they meant he, if they were making, if Billy Cottrell was supposedly making statements to them. He denied making any statements to any of these people in which he admitted he committed arson. It would be absolutely foolish for him to do so, and here is a person who ---- It also strikes you possibly that he may have had Asperger's syndrome, and that was part of the thing. Asperger's has got nothing to do with it. It seems to me when he's talking to his friends, I think your brief characterized it as exaggerating. He's bragging. He's taking credit. And to say later, well, that doesn't make any sense for him to take extra credit, this is the point. It's not a logical thing for anybody to do, and yet he did it. And with regard to sufficiency of the evidence, and I expect that you set that argument up so you could get to the Asperger's argument. On sufficiency of the evidence, it's plain that the jury's entitled to take somebody else's interpretation of the conversation. So I have real trouble with the notion that it would be silly for him to say that. He said silly things. He doesn't say that he didn't do it. I mean, he may be a genius the next Einstein, as far as we know, but definitely he did silly things. That's clear. What I wanted to get to, though, in going through this, is I recognize the insufficiency problems. How would Asperger's, which apparently interferes, we have deficiencies in social skills and communication skills and all that, how does that play into his bragging or talking to people about what he did? How does this all fit in? Well, I'm not sure exactly how that plays in. I can characterize Asperger's syndrome in a way that maybe some of us can understand. It's been called mind blindness. This is a person who is like Data on Star Trek, the character who recognizes that there is a difference between himself and other people. He's trying to understand what human beings are like, or like the aliens on Third Rock from the Sun. They just misinterpret and misunderstand what people are telling them. That's what somebody with Asperger's is like. And it was supported by Dr. Mezeboff, specifically, that an individual with Asperger's syndrome, when confronted with information from an individual that he believed was credible, and in this case, that individual was the person who was with him, who told him that they are not going to commit arson after the first arson occurred. Now, remember, the jury acquitted the arson that occurred on the street before they went on to two other defendants. And so there was something the jury recognized that he, in their mind, was not a member of a conspiracy at that point. Apparently, they then took a look at it and said, well, maybe it should have been foreseeable to him that at a later point, these people were going to go back on their word and would not be honest with him and then would commit arsons, which in fact is what happened. It's like a person who was told, this is not a hot stove. If this were a stove in front of me and I said, I was told, it's not a hot stove, go ahead and touch it, and I touched it and I burned my hand, I would be relying on a statement I believed to be true, but wasn't. A person with Asperger's sometimes can take hours or conceivably a day or so to figure out that they were being lied to. Eventually, they'll process it. It's like a person who could say, I know what three to the sixth power is. It's a number, but we all look at that and say, okay, 3, 3, 9, 27, 81, and go up, but the problem is you don't know it right away. That's just a simple example of how it might work. Kennedy. Does that make gullibility a defense? Can someone simply say, he told me he wouldn't do it and I believed him? Well, that's, it is gullible, I suppose, in some ways, but it's also a situation where the person doesn't have the ability because of his disability to understand and comprehend what the person is telling them. The reason is, and this is why it's so important during the trial, he would be looking off into the lights at the top of the courtroom while he's testifying. He didn't seem to understand when he was told repeatedly he can't do it. Provide hearsay information. He would make responses and do things that were just totally out of character. But that's because people who have Asperger's syndrome don't look people in the face. They tend to look away. They don't have eye contact. They can't read emotions. They can't read feelings, and what they see is something different. I want to stop here and focus. I mean, I understand where you're getting to with regard to his testimony. I'm bothered here, and I've worked hard to sort this one out, because he does present an unusual set of characteristics. I'm not sure it's quite the same as saying not capable. I mean, he's plainly capable of responding. These people came by that evening. He didn't have preexisting plans to go off like this, so he was able to take in their proposal that they go off and do the spray painting, and off he goes. Some things he processes very rapidly. And because it's not as simple as saying blind, he can't see, it's not if you can't see, you can't see. In this case, he can process information. He can act based on what people tell him. There are some things he plainly has difficulty understanding, and that's the reason for the diagnosis. He has struggled with lies. He believes what people tell him to be true. And that's exactly what leads me to say, does this make gullibility a defense? Can an individual come in and say, your standard bank robber, we hear it all the time, I didn't know he had a gun, or I didn't know he was going to use a gun, why should I be liable for the fact that he pulls out a pistol and suddenly I'm facing these more serious charges, and we just throw that out. Gullibility ordinarily isn't a defense. Why is it a defense here? Because this is a recognized situation under the Johnson opinion as a disability which is gross, verifiable. There's a DMS-IV standard for it. It's been in a number of cases, so it's not a gullibility situation. Is this, are you going to, you know, his intent or whether he did things knowingly and understandingly, is that the purpose of this? Essentially that what would happen, had he been given the opportunity to present Asperger's testimony, we would have been able to let the jury see him for what he was. When he was acting out on the stand and doing things that seemed to be strange to people, instead of looking like someone who was a liar, the jury could say, oh, that's got to be a manifestation externally of Asperger's syndrome. It didn't affect his mind in other ways, but his outward mannerisms, that would have been something that they could have looked at and perhaps drawn some conclusions from that based on the fact that both experts said he had Asperger's. He clearly could distinguish right from wrong, and there's no question, but that's not really the issue. The question is one of time. How long does it take for him to make a decision? How long does it take for an individual, for example, to walk across the street? If the person happens to be blind, they may not see a pothole, those are the problems that someone with Asperger's has. The jury can make up its mind. We're not saying it can't do that, but it would be unfair not to be able to present that. Since my time is running short, I'm going to shift into the third issue that we addressed, and that is the inapplicable and unproved enhancement in this case, and that was under U.S. Constitution. The Court there said that the act of arson had as its motive to intimidate or coerce a civilian population, but the Court, number one, misapplied that, as particularly I think was addressed in the reply brief that we filed, that the issue was not intimidate but versus influence, and the Court flipped the influence to government versus. But there was no proof of it. There were four special allegations which were supplied to the jury a month before. The government chose not to put that in, and when the Court made its ruling, it had absolutely no factual underpinnings which would support its ruling. The people, excuse me, the prosecutor. Wait, wait, wait. What kind of reason debate is made up of slogans painted on the side of cars? I mean, I have a little difficulty when those issues, this is meant to cause other people to draw back, and you're just engaging in an effort to influence, not to intimidate and coerce. That's a tough sell if you're out there spray painting these kind of things on cars. Well, this isn't a spray painting case. He's charged and convicted with arsons. I'm trying to give you the benefit of the doubt. If it's arson, arson is clearly not something designed to persuade. It's designed to scare. There's no relationship between the two. That's what I'm suggesting. If you look at it, if we had graffiti around the city of Los Angeles, and other cities as well, and that was associated with arson, all these cities would be on fire because there's so much graffiti that's all around. There's no relationship between the two, and it'd be... Well, if the same person's doing it, it is. And he doesn't, if you... If he's dead. Except for a moment that he's convicted of arson, and we'd only get the sentencing if he's been convicted of arson, there's no real question that the arson wasn't a frolic that happened accidentally. It was part of the same scheme. At least the other two people were part of the same scheme. It wasn't an accident that it was an SUV that got fire bombed. So that's why I point to the spray painting. That's where the message comes in. But the act of arson seems to me plainly to be an act of intimidation. It's not an act of persuasion. Well, there was... The arson is definitely what would appear to be intimidation. The problem is whether it's directed at a civilian, or whether it's directed at a government. And the problem is the court looked at it, and the court made a finding, and the finding was exactly opposite. The case, the Jordy case cited by the prosecution and its opposition is not only... Turns out to be from the wrong circuit. They made a mistake there, but it also turned out to elucidate the fact that it did not support the issue, because the language was totally different, the difference between influence and intimidate. I would, if possible, like to reserve the remainder of my time for rebuttal. What about the aiding and abetting instruction? Did the district court say that knowingly participating was judged objectively? Whether someone... Aiding and abetting. Whether it was foreseeable. Yeah. That was the instruction that was given, whether it was foreseeable to an average person. I mean, it wasn't foreseeable for the first episode on the arson that occurred out on the street. But it was foreseeable when he went with them to the average person, if they had thought that he had Asperger's, it quite well would not have come to that conclusion. They could have... And given the fact that they acquitted on that count, if they hadn't acquitted on that count, they couldn't make this argument. But common sense tells you that when they all voted not guilty on that count, they didn't think he had any participation or any action that he was involved with as far as that arson on the street. Well, you know, looking at this page 271 in the transcript or in the excerpts, and the judge is talking about, I think it's the judge talking about, as to aiding and abetting, as to knowing and intelligent. Again, the question is whether or not Asperger's disease would apply to that. It does not, again, appear to be relevant here. That has to be an objective standard. Otherwise, every aiding and abetting case that came before the court would be judged by a completely unique standard of every defendant that came to this court, depending on what the defendant's ability to process information was or not. And it would be a completely subjective standard. And the court, in its decisions, the courts, in its decisions, have never held that to be a legal, an appropriate legal measure. But what I'm wondering about is that to aid and abet, you have to knowingly and intelligently participate. And I'm just wondering why that isn't talking about something that's subjective. The problem is with aiding and abetting, he didn't knowingly or intelligently aid and abet. That is where the Asperger's syndrome would apply. So we're relevant to that instruction on aiding and abetting. I guess it is aiding and abetting and conspiracy that your argument's aimed at. But we don't know whether the jury convicted as principal or aiding and abetting, so we have to accept the proposition it could have been aiding and abetting, and that's the basis, the foundation for your argument. I think we have to assume that because if he'd been a principal, although the prosecutor started out by saying he was a principal who organized it, if that were the case, they would not have acquitted on the first arson. So I think we have to draw the conclusion that it was aiding and abetting and the foreseeability issue was what they were looking at. So that's why Asperger was so important as far as foreseeability. As a defense, it was crucial. And it was basically undisputed. Typically, you'll find cases where experts are going all over the board. Here, everyone was in agreement that this was a problem that Billy Strell had. If I might get a moment or two to sum up at a later point on rebuttal. Yeah, we'll give you a little time for old times' sake. I appreciate that, Your Honor. Thank you, Your Honors, for letting me set up. May it please the Court, Bruce Reardon on behalf of the United States with me at council table is Andrea Russi. Andrea Russi participated in the writing of the appellate brief. She's part of our appellate section. I also was one of the lawyers who participated in the trial with my learned and respected adversaries, Mr. Mayock and Mr. Rudnick, who I also have known for quite many years. This case is a case where there are three distinct issues, as the Court has recognized. Those three issues are different, but the United States would submit that there is one very real similarity between those three issues, that there is very little legal dispute over the standards to apply, for instance, with insufficiency. That standard is clear. Over the abuse of discretion standard to apply to judge the trial court's decision to exclude the evidence, and ultimately over whether his sentence was reasonable. Now, there, there is the application of a sentencing guideline that this Court can and will, I'm sure, review de novo to make sure that enhancement was properly applied. But with the first core issues in the case, the sufficiency of the evidence and the exclusion of the Messeboff evidence, those are fact-based analysis. The record is where we should look. I'm sure the Court already has. It's clear the Court already has. And I will direct it back towards the record and the evidence. Specifically, I'll go right to the Asperger's Syndrome issue, because the United States agrees that under the standard by which the insufficiency of the evidence or the sufficiency of the evidence is judged, the evidence under that standard seemed the best light for the prosecution, the standard whether any rational jury could convict. The evidence is very strong. There were a long series of admissions by the defendant. When viewed in the best light, admissions to his friends, and this was testimony from November 12th and November 15th, that we destroyed Hummer's Operation SUV was successful. It was hard breaking the back window, as he said to Daniel Feldman, so we broke a side window. He told Claire Jacobs that we were only supposed to burn two. The fire was bigger than we expected. He told Sarah Lyon that he had participated in the planning and execution of an attack on SUVs. And very importantly, he told the L.A. Times on September 15th and 16th in a series of e-mails that I am among those responsible. I am one of the true culprits. At that time, he was mocking the FBI for what he considered incompetence. I think it's safe to say from his e-mails. However, he misjudged the great competence of his colleagues at Caltech who found his e-mail cachet within hours of him trying to send a protected or laundered series of e-mails. So that evidence, I would submit respectfully to this Court, seen in the light most favorable to the government, is overwhelming. But would a normal person react that way? That is the key issue here, is the Asperger's, Your Honor. And if I can answer that in two steps. First, the record here was very limited on this issue. And one refrain that is repeated by the district court, who I would submit did a model job of review, providing both sides with ample time to brief. Both sides filed motions to reconsider. Both sides were allowed to argue until there was nothing further. And the district court indicated how much work it had done and research it had done on the issue. That said, the record, the record, the evidence before the district court, the Mezebov Diagnostic Report from July 9, 04 is not in the appellant's opening brief, nor is it referred to in the appellant's opening brief. They discuss, as Mr. Mayock did here, very eloquently, as he does in front of trial courts and juries, his opinions based on perhaps outside reading of a variety of sources that are in the appellant's opening brief. Pages 3, 4, 5, pages 27 through 31, a UCLA report that's not sourced. This referenced data from Star Trek. There's no source for that. The Atwood articles, they're sourced as if they were in a journal, but that was not before the district court. The district court had the Mezebov Diagnostic Report before it. It's six pages long with one sentence on the seventh page. It's in the government's excerpt of record at pages 1 to 7, GER 1 to 7. I know the court has reviewed that. I have also had the opportunity now to review it a hundred times. But from the beginning and now today, our position is not asking this court, nor are we seeking to make any broad pronunciations or pronouncements about Asperger's syndrome. Instead, we had the Mezebov report before us, and we had the Keenan report. That is in the excerpt of record, pages 180 to 203, I believe, the end of Volume 1. It's a much more extensive report than Dr. Mezebov's. We're not challenging the authenticity of Dr. Mezebov's seven-page report or his competency, the first two tests of evidence. We challenge its relevance. We are challenging and maintain the challenge that all that extra record material, the slow processing like dial-up, the third to the sixth power, Atwood, Time magazine, UCLA, that is not authentic evidence. It is not competent evidence. It was not relevant evidence. It was not before the lower court except in form of argument and opinion by counsel. It is not proper, I would suggest, that it would be improper for this court to review a trial court's abuse of discretion standard evidentiary ruling by using material that was not before the trial court, is not part of the record, and the government doesn't have copies of, they're only references to reports. And now to get to your question, Your Honor, I believe that context was helpful. I hope it was. But be that as it may, what is in the Mezebov report? Summarized by Dr. Keenan, who also says, yes, this individual does fit the diagnostic criteria for Asperger's. That is Gary Mezebov's conclusion. And both Dr. Mezebov and Dr. Keenan say he has problems with social interaction. Dr. Keenan says it three to four times in his conclusions, I think at ER 198 or 199. Dr. Mezebov says he has no cognitive problems, no language acquisition problems. Dr. Mezebov says on page three of his report no eye contact problems. He does report that Mr. Cottrell's mother indicated when he was younger he had problems following the gaze of people. But Dr. Mezebov, in his six hours of contact with Mr. Cottrell, found no such problem. What Dr. Mezebov does say, and I guess we've all become little tiny experts in this subject, what Dr. Mezebov does say is you have to have a social or a cognitive or an occupational, I'm sorry, a social or an occupational hindrance to fit these diagnostic criteria. And Dr. Mezebov said he has a social hindrance. He's had particular problems when he was young in social interaction, social awkwardness, social skills. He's a highly functioning young man, particularly in his field, and more so as he got older. Dr. Keenan finds the same thing. And as he became more accepted, for example, at Caltech. He was a fully functioning adult, no cognitive problems. The issue of he can't process, the time issue that Mr. Mayock was referring to, is not in the record of the Mezebov report. There is a quote that they rely on in their opening brief and they rely on in their reply brief, and they relied on three times in the record below. I do not like to characterize things in any sort of a negative way. I can only say that that quote, as we point out in our brief, has no source. It is a quote that is ostensibly from Dr. Mezebov, but it is not in the record. They cite it, when I point that out, when we pointed that out in our brief, their response was, well, we quoted it three times before at excerpt of record 102, I believe 172, and 316. Yes, they did use that quote three times before, but that quote has no source at each reference. It's like an M.C. Escher painting to the extent such metaphors apply in this setting. It just refers upon itself. It's self-referential. Be that as it may, this issue of time delay, this issue of mental blindness, was not part of the Mezebov report. Mezebov's report, and he's a well-respected doctor, we're not attacking him, but it's fair to say that report is short and relatively cursory. A six-hour interview, interview with friends, conclusions that Dr. Keenan agrees are fair and appropriate, a diagnostic criteria that's appropriate, the diagnostic report. However, Dr. Keenan's 25-page report includes all of his sources, footnoted to a fare-thee-well, frankly, and impressive even by law review standards, I think, be that as it may, by Blue Book standards. Dr. Keenan refers to the 7904 Mezebov report, which he reviewed in his 110204 report. That's it that was material before this Court. The United States reviewed that, determined, as parties are obligated to do, that wasn't relevant, and did what I think this Court has always indicated and the Supreme Court has indicated, file a motion pretrial. A procedural motion was filed before I was on the case. That motion was denied. I was on the case a week or two later. A substantive motion was filed to relevance. I'm not indicating I had anything to do with that. I was just putting my place in the hole in the line. A substantive motion was filed. That motion was heard on November 9th. Judge Klausner, all part of the record, and a refrain that Judge Klausner makes repeatedly. On November 9th, November 12th, when he makes his final ruling, that's on a Friday in the middle of the government's case. Again, in the new trial motion in January, which is in the GER, at the end of the GER, I think around 370, 374, but memory may fail me. And finally, at sentencing, which is in the ER for appellate, Judge Klausner repeats a refrain that roughly goes like this, That's not before me, counsel. That's not what's in front of the Court. There's nothing here to go to mens rea or intent, a point that was raised a few minutes ago by the Court. What I have before me is social interaction, social skills, gullibility, a point that was raised by the Court. Judge Klausner took, I think, the model approach and said, that's not relevant, and informed counsel when counsel said at November 9th before opening, We can get into the syndrome. We can get into the symptoms. No, that's not relevant. The only thing that may be relevant is it may be relevant to the foreseeability issue under Pinkerton theory if the defendant testifies. We, the United States, asked for additional help. To be fair, the judge also criticized our briefing as not containing enough information for him that was insufficient. In the face of that, we've, I think, 20 years of practice, which I know to this Court may not seem like a lot, but it's enough to know that when a judge says your briefing is not sufficient, I, and particularly now that I'm supposed to be senior, would say to any counsel junior to me, You get up and respectfully ask if the Court wants further briefing. I can't imagine doing anything else, and we did do that. We didn't file a third motion. We didn't attack Mezevoff. We didn't in any way try and trip up the defense. We did what any counsel would do when a trial judge has said, or an appellate judge, your briefing was insufficient on an issue. We apologized. We asked for more time to brief. The Court said everybody can brief. I'm going to listen to opening statement. I may change my mind. With that, I'm not going to preclude anything right now. With that, the opening statement was given. A discussion of Asperger's was made extensively by counsel during opening statement. Three days later, the judge had a November 12th hearing, indicated I have now got additional briefing, and I've done additional research. So still, I think, fairly calling us to – suggesting our briefing could have been better. I've done additional research, and here's my ruling. It's not relevant. What's in front of me has nothing to do with intent or knowledge. The aiding and abetting issue, Your Honor, that you raised, the Court talked about it as an objective standard because the defense said foreseeability also applies to aiding and abetting. Ultimately, aiding and abetting does require knowing an intentional – you have to knowingly have an intent. A defendant must knowingly intend to assist or push along the enterprise in which they're aiding and abetting. That is absolutely law, and the judge instructed on that in the instructions. The instructions are in – bear with me – the E.R. I knew I'd make that mistake. The government's excerpt of record at pages 322, 323, 324, the judge did properly instruct on the aiding and abetting, and that was an objective, too. Counsel, I have a question on that. Did he have to knowingly aid and abet arson as opposed to knowingly aid and abet a property and spray paint the slogan installed? That's a question that the trial judge also asked us, Your Honor. At the end of the November 12th hearing, he raised that to us. Our position was – we thought the best position was, and the evidence supported, to take the clearest position, which is we needed to show that he intended to enter a conspiracy to commit arson. That would be the first theory of liability and, of course, the theory of count one, and that he – if – an alternate theory would be that he intended to aid and abet the arsons. And, finally, there'd be a foreseeability theory that the facts to an objective person, not, as the defense said, to a reasonable person with Asperger's, but to a reasonable person would be clear that arson was going to take place. And, by the way, I point out that we have the defendant, by his own admission, driving a carload of Molotov cocktails around the San Gabriel Valley that evening for several hours. There's a test case that's run, which the defendant tells Claire Jacobs doesn't make any distinction between his activity and others and doesn't make any distinction, for at least a month after the event, between the arson and the vandalism. Notably, doesn't make any such distinction to the L.A. Times when he takes responsibility and says, I'm one of the true culprits. At the test case in Monrovia, an hour later, they're at Clippinger, and now there's an arson, there's a firebombing of Boston Kareem Field's SUV. It was not a Hummer. I believe it was a Ford Explorer. An hour later, there is the seven firebombs of the Hummers that burns into the obliteration of the service building. We did show, I think, evidence on the record and certainly under the standard of sufficiency for any rational juror to decide that this individual aided and abetted. The jury was entitled, we think the law is clear on this, to disregard or to – there were two interpretations of Mr. Cottrell's testimony. One, that it was self-serving and that it was dancing along eggshells. Another, that it was truthful. The jury selected apparently the one, but I also point out that it raises a point. I don't – I believe the law is settled and has been settled for as long as I've been a prosecutor, and certainly I have received this information over the years. A prosecutor certainly – and we are held to a high standard – is not to speculate about a jury's verdict. I believe that there is a strong law on that. In other words, the fact that the jury acquits on one count is not evidence as to the other counts at all. Otherwise, a prosecutor could say, well, gee, it showed that they deliberated a lot and that they did their job really well, which I think is what prosecutors are supposed to say after verdicts and say the right thing. In other words, the lengthy discussion of the jury's acquittal on count nine, it was a separate count involving a different set of – a different charge, the use of a firebomb and the aid of violence. The jury acquitted on that. They are entitled to do so. We accept that. We draw no inference from it. We don't think the Court can. And then finally, I'd point out that – or I would add that if there's one point that in my sometimes limited advocacy skills I can make, it would be that I would not go to the insufficiency. I would go to the Mezuboff report. I'd ask the Court to read again the Mezuboff report. Roberts. Let me stop you there, because I think that is – that's the hard issue for me, at least. And it's a hard issue at the intersection between the foreseeability – that foreseeability is properly judged based on a reasonable or objective standard, not tailored to individuals. And yet we do tailor for individuals, as the Johnson case reflects, or if you've got a blind man or a deaf man, we don't, even though the reasonable objective observer would be able to say, sure, you'd see that. You're blind. That expectation isn't there. And in this case – and you said some things that have given me some stuff I want to go back and look at with regard to exactly what it was that was presented by the defense. And yet, at least in one of his preliminary rulings, the District Court left the door open for evidence on Asperger in case defendant testified in such a fashion that the District Court said it could speak to his credibility in saying, I wasn't aware, which suggests that the District Court understood, perhaps, that the report only reached the diagnosis, but someplace you've got to make another step that says how it would have affected this defendant. So the District Court seems to have filled in, or at least inferred that gap would be filled in by evidence if he, in fact, testified and said, I didn't understand. I wasn't aware. So as I try to figure out what the District Court was doing, I'm not so sure that the fact the report doesn't itself make that second step was it. It seemed to me the District Court was mostly saying, look, foreseeability, subjective, and we're not going to set a different standard. So there's my quandary. Yes. That is, I believe, also the heart – we believe also the heart of this appeal to the extent that we can be so presumptuous to suggest to this Court that there is a – that the November 9th hearing is the hearing that the Court is referring to, the pre – just before trial begins, Judge Klausner does come out and say, I've reviewed this clearly. I find that Asperger's is not relevant, except it may be relevant to this issue of foreseeability if the defendant testifies. That's the hearing before the opening statement. Counsel for the defense seeks to clarify, and, in fact, does clarify to some degree by saying, well, we can get into the syndrome, the symptoms. The judge says, no. That doesn't go – that's not before me, which it wasn't. I agree. The Court at that point was saying, I'm really not sure, because the briefing was inadequate, what the right standard is for foreseeability, but if it's subjective and the defendant testifies, I had this syndrome which affected my decision-making, that might be relevant. I'm going to keep an open mind. The judge literally says that it's in the excerpt of record from the November 9th hearing that has been put in the excerpt of record from appellant. I'm going to keep an open mind. I'm going to – I'm sorry. I'm going to listen to opening statement, and I may adjust my ruling as time goes on. Later in the new trial motion, the January 3rd new trial motion, which is at the end of the government's excerpt of record, 370, 378, that area, the judge has a lengthy colloquy with defense counsel over that issue, where defense counsel raised an issue that, as you say, Your Honor, we were confused. At that point, we didn't know how to proceed. And the judge says pretty accurately, as reflection turns out, no, I said that I was going to listen to opening statement. I said I – you asked – people said they'd brief this further. I allowed that. And then three days later, I ruled clearly that foreseeability is an objective standard. Johnson – and that was the appropriate ruling. Johnson – I'm throwing over time, but I want to do this in pieces, because at that point, it seems to me that the judge had the Messobob report. He knows how far it went. I presume he probably pointed this out to him, but it was apparent that it reaches a diagnosis. It doesn't speak directly to how the defendant's behavior was affected by that. Certainly, it doesn't and can't say at this particular time he didn't understand, but it doesn't say everything that's been said since, and yet the judge presumably understood that something would be offered up to that end, because otherwise, he wouldn't have even suggested that if his credibility is on the line, then it may be admissible. So what I'm really getting to is it seems to me that the real focus here of the district court's decision goes right back to the foreseeability being judged on an objective standard, and it's almost back to the gullible version I raised earlier, that we're not going to listen to that. And that's where you have the potential collision between what is the law with regard to what the standard is and the recognition that we still treat some people differently in a case like Johnson. And it took me so long to get to my answer that I didn't get there. It also indicates to the defense counsel that, you know, go ahead and make your opening statement. You can include that, but it gives them some confidence that that's the way it's going to be, because otherwise, it can be devastating. May I answer both questions? For the first, and I will get to the some confidence question, which is why we so strenuously tried to get this court reporter to find and produce the curative instruction, which we included a couple of weeks ago by way of motion, which we think is a very thorough curative instruction. To the extent that it was necessary at all, the judge does say what the lawyers did was proper at the time. Asperger's is not in front of you. It's not relevant. But to get to Judge Clifton's point, the judge does indicate that and does later say at the new trial motion, this happens in trials a lot. I have to find out what the evidence is, even if, he says to defense counsel, the judge says, even if, even if I hadn't said it was tentative, even if I had said it was my ruling, I'm still entitled to change if the evidence doesn't conform to that. So that new trial motion transcript at the end of the government's excerpt of record I think answers some of the questions you're asking. But it wasn't that he heard the evidence and then decided, well, the defense can't link up the expert's testimony to what happened, because that isn't the evidence that he heard and evaluated during the first three days. So all I'm really getting to here is I understand what you're saying with regard to the limitations of the Messobob report, but I don't get the sense that that's what the district court was plotting the chips on. No. I think the district court, I think that's fair. I think the district court, particularly under an abuse of discretion standard, where, as my understanding is, this Court must find there was clear error of the district court's factual finding, it may be that different judges would rule in different circumstances. But I don't believe that you can find clear error here, specifically where much of the challenge is from material that wasn't before the judge. What the judge did was not clear. It's not a clear error standard, though. If it goes to the question of whether there should be a Johnson-type exception to the objective standard, that's a much more legal situation. That is illegal. And that would be only erroneous on the law. You're right. And that's why, really, both of us have gone to the trouble of looking at these two factors, because I think it makes a difference with regard to the standard to be applied. We think that Johnson is squarely in the – in support of the judge's ruling, because while Johnson does talk about an identifiable gross disability, Johnson also finds that the battered woman syndrome, which is a very similar DSM-type syndrome to Asperger's, is not such of an identifiable gross disability. I cannot ask this Court to make, and do not ask this Court, we do not ask this Court to make sweeping pronouncements about Asperger's because the record isn't here to make it. What we do ask is that on this record, on these facts, what was presented to the district court was not a Johnson-type gross and identifiable disability. Dr. Mezovoff certainly doesn't describe it as such, nor does Dr. Keenan. It is both fine, and we don't challenge, that Mr. Cottrell fit the diagnostic characteristics of Asperger's. There's about a few more paragraphs of discussion of that with regard to social awkwardness and social interaction. And as Judge Clifton pointed out, the judge, trial judge, said basically you're saying gullibility is a defense. I don't agree that it is. And the trial judge did two other things that I'd like to point out to this Court, and then I will stop and allow my learned adversary to speak. Why wouldn't this be relevant to the – on the aiding and abetting charge, knowingly and intelligently and understandingly and all that? With all due respect, Your Honor. The other question I ask is, so what harm could have been caused by the result of it, had the judge let it all in? Why didn't he just let it in and see what happens? With all due respect, on the aiding and abetting and on the knowing and intent to form a conspiracy, we think the evidence is strongest there. We think the support for the judge's ruling is strongest there because, as the judge kept saying, I'm not being offered evidence about intent, and the defense agreed on that. The foreseeability is the – we would suggest the crux here. Did the Court apply the right standard? We think he did, the objective standard. Is this – is the evidence in this record, in this case, enough to make this a – exactly? For example, in a case involving the reading of documents, perhaps a mail fraud case, we considered the same metaphor. If someone was unable to see, that could – that's the type of disability that may well be relevant in another case. Perhaps in another case, evidence about mental blindness or autism or time delay, which was not evidence in this case, might be relevant. But in this case, there's no gross and identifiable disability. Johnson was appropriately applied. And with regard to your final question, Your Honor, what harm would it do? That is every counsel's decision when you make a motion for relevance. We seek to protect the record as best we can. We try and do it in the best faith and the most proper method we can, more importantly than what we try and do, much more importantly. And I think this goes back to a question you asked a while ago about prosecutors having too much power and maybe the new rules allow judges to have more power. And I've practiced long enough now in federal court since 86 when there were no guidelines, so I have a little bit of memory of that time. We trust the judges to make that decision. Some prosecutors, like myself, had to labor under the guidelines for 15 years, too. We trust the judges to use their discretion. Judge Klausner did. He was neutral throughout. He pushed both sides at times. He made full and fair findings, giving this court a lot of meat on the bones. And we think when you review that, you'll find that there was proper legal standards were applied. He didn't have the kind of record that this court could find was an abuse of discretion. And, in fact, of course, we think he applied the right standard and made the right ruling. We didn't seek to do harm, or we weren't worried that the evidence would do harm. We thought that it was not relevant, clearly, and we made our motion as such. Anything else, Your Honors? Good. Thank you. I'll be brief. First of all, with respect to Rule 12.2B, it says, as to Asperger's syndrome is related to a mental disease or defect or other mental condition. Clearly, Asperger's syndrome is something which is an other mental condition, which is very well established. There's no dispute here that Asperger's exists. In fact, I'll just put this aside without quibbling. The Time magazine article was referenced on excerpt of records at page 199. But I would say this. The fact that Asperger's was recognized by everybody in this case means this is the perfect case. You can't find a better case in order to develop the issue of whether some sort of permission to go forward with an Asperger's defense exists. This is that case. Because other cases that have come down the pike have said, have one expert saying yes, another saying no. Here, everyone's in agreement. Well, everyone's in agreement that he can be diagnosed with it. But the record's a little skimpy with regard to what that means with regard to his conduct here. That's true. We did explain to the Court, however, in a motion that was filed ex parte prior to the trial, what it meant to him as far as his ability to understand and comprehend. And so that perhaps was what we felt was assisting the Court in determining that it didn't need to have additional information provided in that area because it already was fairly clear that this was a problem that Mr. Cottrell experienced. It was a disability that is verifiable and everyone verified it. I would want to say a couple of things about the aiding and abetting issue that was briefly mentioned. Billy Cottrell clearly aided and abetted spray painting, not conspiracy. Claire Jacobs, who the prosecutor just referenced, testified that Billy Cottrell said that he left Clippinger's and went and sat in the car. This is when the other people were committing the arsons. That doesn't show that he was an aider and abetter to anything other than spray painting, which is what also occurred at that particular site. Well, spray painting is probably guilty as a principle, but he wasn't charged with spray painting. Exactly. If there had been a spray painting charge, it might have been different. He would have been guilty of that, but that wasn't a charge. Lastly, and I know I'm running over my time here, I keep thinking of the, perhaps this is the best time to say it, the McDonald's jingle, you deserve a break today. Throughout this trial, Billy Cottrell really didn't get a break. The evidence that was introduced against him, a lot of which was misconstrued and basically misapplied as one problem. He did testify, however, he did not commit arson. So there was evidence in the record that he didn't, that he didn't know what these people were going to do. He didn't act to support their activity. And when the court said at the beginning of the case that we go ahead with our opening statement and make the argument about calling witnesses and then three days into the trial, allowed us to, or didn't allow us to go forward with any information about Asperger's, said it was completely irrelevant, that prejudiced my client. It wasn't fair to him. Well, you knew the issue was open. I mean, there are, I've been in trials where the issues are open and after that you've got to make your judgments and hedge bets. And it may be hard, but it wasn't that you were surprised that the judge might make that ruling. But at that point, we asked the court and provided specifically a cautionary instruction saying don't blame the defense attorney. They didn't do anything wrong in this. This was a decision that was made. Instead of just, it doesn't exist, don't consider it, and then move on. And then we go through another week of trial. And finally we get to the point where the judge then makes this statement to the effect, well, don't consider Asperger's. In the meantime, we're precluded from presenting any evidence to the effect that he acted strangely with these other witnesses to whom he had spoken because that would have gone to Asperger's. So cross-examination was impacted. I would say that the issue here is did he act knowingly in entering into conspiracy or to aid and abet a conspiracy, or was he a dupe? That's where Asperger's comes in. That's why it was so important for the jury to hear that. If that were presented to the jury, they could well have come up with a decision entirely different on counts one through eight, the same determination they made on count nine. And it would not have hurt. What would the damage have been done to express this and let the jury draw its conclusion? So our conclusion here is that at least we deserve a remand for a new trial, that the courts need help with determination of what Asperger's Syndrome effects will be because this will not be the first nor will be the last case to raise this issue. Other cases are being tried now with that as an issue, and someone has to give some direction to the judges on the bench and to the practitioners about what the law is and whether this sort of evidence will be admissible or not. Well, what about the argument that, yes, all right, he had Asperger's, but we have no expert testimony as to, you know, the consequences of that. What effect would it have on his thinking and all the rest of it? Well, he, as the Mr. Reardon has said, has apparently did not go into the specific effects of it, but there was information that was provided by virtue of reports that it obviously had some sort of an effect. Both physicians said that he had Asperger's Syndrome. It was argued to the court that it would impact his ability to, in a timely fashion, understand what was going on. That was in the motions that we filed with the court. So clearly the judge had to know that's where we were going with it. There was no real surprise. And the only surprise was the surprise when we found on the third day that Asperger's Syndrome wasn't going to be coming in, as evidenced in this case. Did any experts testify that that disease would impact his decision-making ability? Dr. Mezeboff said that. That would be something that would be standard in the DSM-IV reviews, that that would be one of the characteristics that Asperger's Syndrome causes people to have brain burps or different problems where they don't quite understand what's going on because they don't look at people. In fact, these are the kind of people they give little happy faces and angry faces and other things to so they can identify what emotions other people have. Whether someone is lying to them or not is going to be a problem. And that's what these doctors would be asked had they been able to testify. And the issue is not whether he can determine right from wrong, but whether there was this other mental condition, namely Asperger's, which was a condition which caused him not to be able to come up to conclusions quickly when somebody was misrepresenting facts to him. Well, are you saying that the fact that when the judge ruled against you on Asperger, that that precluded you from bringing in other experts or going into the subject of the consequences of that disease? That was the understanding. He said there is no Asperger's. I thought that was fairly clear that we weren't going forward with any testimony relating to Asperger's once he made that ruling. And we complied with that, as we should. But it prejudiced my client's case, and clearly the jury was confused because, although it's speculation why they acquitted on the first SUV fire and not on the others, but that was an important concern. Lastly, I'd say that there is no basis in fact under the facts or the law to support the 40-month enhancement that was thrown into the mix at the sentencing. Where is he now? He's now in Lompoc. Lompoc. Yes. How's he getting along there? Not well. I could say that his Asperger's is a problem that continues to cause him difficulties there. Relationships with people. Every time he's been in prison, he will stick out an arm and say you can't pass in line for gang members who are trying to cut in, because that's not right. And he's experienced some consequences when he's changed the TV channel because they were supposed to watch the news at a particular time, and other people said no, we're watching our program, and they all were in another gang. And so he's not faring well. So he has had some experiences that I know are going to be lifelong lessons that he's learned, and is learning, much different from a Cal Tech. Thank you. Okay, thanks very much, and we appreciate the excellent arguments on both sides of this case. They were helpful, very helpful. And with that, we'll recess until 9.30 tomorrow morning.
judges: Pregerson, Gould, Clifton